**Polly Ann BARBER, on behalf of herself and all other persons similarly situated, Plaintiff,**

v.

**KIMBRELL'S, INC., and Furniture Distributors, Inc., Defendants.**

**No. C–C–74–95.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

Nov. 29, 1976.

Donald S. Gillespie, Jr., Legal Aid Society of Mecklenburg County, and G. Miller Jordan, Charlotte, N. C., for plaintiff.

Fenton T. Erwin, Jr., Lindsey, Schrimsher, Erwin, Bernhardt & Hewitt, Charlotte, N. C., for defendants.

## MEMORANDUM OF DECISION AND JUDGMENT

McMILLAN, District Judge.

### PRELIMINARY STATEMENT

Polly Ann Barber filed this action on May 3, 1974, seeking civil penalties under the Consumer Credit Protection Act ("Truth-in-Lending Act"), 15 U.S.C. § 1601, *et seq.* On June 11, 1975, a class was certified under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, consisting of the plaintiff and persons who, between July 16, 1973, and May 3, 1974, had entered into consumer credit transactions at the downtown Charlotte Kimbrell's furniture store. Class notice was given; some opted out; the class numbers approximately 740 members. Furniture Distributors, Inc., also a North Carolina corporation, was added as a defendant on April 15, 1975; discovery proceeded; motions of defendant Furniture Distributors, Inc. for summary judgment were made and denied; and the case was heard on June 7, 1976, on cross-motions of the various parties for summary judgment.

The court finds that the defendants have violated the "Truth-in-Lending Act," and are liable to the individual plaintiff and to the members of the class she represents.

## PURPOSES OF THE TRUTH–IN–LENDING ACT

The Truth-in-Lending Act was adopted in 1968. It does not regulate interest rates. Instead, its purpose is to require that lenders provide consumers with *information, clearly and understandably stated,* so that they can determine what they are paying for the credit extended to them, and so that they can compare costs of credit available from various sources and shop around intelligently for the best terms. It requires that certain specific information be given in the documents covering the transaction, and it provides penalties for failure to disclose the necessary information. See 15 U.S.C. § 1601 and annotations. The decided cases talk in terms of the duty to " 'assure a meaningful disclosure of credit terms' to consumers," *Gardner, et al. v. Board of Governors of Federal Reserve System, et al.,* 150 U.S.App.D.C. 329, 464 F.2d 838, 841 (1972), or "to protect consumers by providing them with accurate information so they could shop for credit," *Bostwick v. Cohen,* 319 F.Supp. 875, 877 (N.D.Ohio 1970). As the Fourth Circuit Court of Appeals stated in *White v. Arlen Realty Co.,* 540 F.2d 645 (4th Cir. 1975), the Act is intended to prevent the public from misleading and confusing credit disclosures and to insure full, complete, accurate and uniform consumer credit disclosure, to make possible informed comparison shopping for credit.

The Supreme Court of the United States said in *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973):

" . . . [Consumers remain] remarkably ignorant of the nature of their credit obligations and of the cost of deferring payment. Because of the divergent . . . practices by which consumers were informed of the terms of the credit extended to them, many consumers were prevented from shopping for the best terms available . . . [S]uch blind economic activity is inconsistent with the efficient functioning of a free economic system such as ours, whose ability to provide desired material at the lowest cost is dependent on the asserted preferences and informed choices of consumers. The Truth-in-Lending Act was designed to remedy the problems which had developed." Pp. 363–364, 93 S.Ct. pp. 1657–1658.

## JURISDICTION

The court has jurisdiction over the parties and the subject matter under 15 U.S.C. § 1640(e); the suit was brought within the time limitation; the case is at issue and is properly before the court on the pending motions; the class has been properly notified; counsel have been fully heard in argument and in brief; and the case is ready for decision.

## THE FACTS ABOUT POLLY ANN BARBER'S CASE

On July 16, 1973, the named plaintiff, Polly Ann Barber, entered into a retail installment contract at the downtown Charlotte Kimbrell's furniture store, for the purchase of a green velvet sofa bed, a four-piece walnut bedroom suite and a box spring and mattress. At the time she owed Kimbrell's $65.00 from a previous credit purchase which had been subjected to a previous finance charge. The old balance was added to the price of the new purchases in an "add on" transaction and the old and the new balance were consolidated into one "PURCHASE MONEY SECURITY AGREEMENT," to be retired by the payment of twelve equal monthly installments. Ms. Barber executed the agreement.

A photocopy of the instrument ("PURCHASE MONEY SECURITY AGREEMENT") is attached and is the next page of this opinion. It bears the legend "APPENDIX 'A' " at the bottom.

**PURCHASE MONEY SECURITY AGREEMENT**

**KIMBRELL'S, INC.**
CHARLOTTE, N. C.

*Will Notify*

SALESMAN: *Brown*

| DATE | Day | Month | Year |
|---|---|---|---|
| | 1 | June | 72 |

| SELLER: | | |
|---|---|---|
| BUYER (Full Name) | Polly Barber | |
| RESIDENCE PHONE | 376-2571 | BUSINESS PHONE |
| RESIDENCE ADDRESS | 716 E. 11th St Apt 3 | MAILING ADDRESS |
| CITY | STATE | ZIP CODE | DIRECTIONS |

SELLER sells BUYER the CONSUMER GOODS described below (hereinafter called the GOODS) retaining a purchase money security interest therein, upon the terms and the conditions set forth herein on the face and reverse of this original Purchase Money Security Agreement.

| QUAN. | MFGR. | NO. | ARTICLES (DECRIPTION OF THE GOODS) | CODE | SELLING PRICE |
|---|---|---|---|---|---|
| 1 | Kindel | 9009 | 2 Pc Sofabed Green Velvet 4/72 | N-65 | 269.95 |
| 1 | Thomsn | 830 | 4 Pc Bedroom Suite Walnut | N-56 | |
| 1 | | | 4/6 Box Spring & Matt | L-23 | 299.95 |

*Mdse delivered*
*7/16/73*
*layaway since 1 June/72*

**ADD ON:**

| | | | |
|---|---|---|---|
| 1. Previous (old) Balance | 65.00 | TOTAL → | 569.90 |
| 2. FINANCE CHARGE Discount | 1.46 (Rule 78ths) | SALES TAX → | 22.80 |
| 3. Net (old) Balance | 63.54 | 1. CASH PRICE → | 592.70 |
| 4. Cash Price New Purchase | 592.70 | CASH DOWN PAYMENT | |
| 5. Total | 656.24 (Sum 3 & 4) | Trade-in | |
| Cash Down Payment | 302.24 | 2. TOTAL DOWN PAYMENT (new purchase only) | |
| Trade-in | | 3. UNPAID BALANCE OF CASH PRICE (new purchase only) | |
| 6. Total Down Payment | 302.24 | 4. RECORDING FEE (new purchase only) | |
| 7. Unpaid Balance of Cash Price (new & old purchase) | 354.00 (5 less 6) | 5. AMOUNT FINANCED (Sum 3 & 4) (new purchase only) | |
| 8. Recording Fee | | 6. FINANCE CHARGE | 40.54 |
| 9. Amount Financed | 354.00 (Sum 7 & 8) | 7. DEFERRED PAYMENT PRICE (Sum of 1, 4, 6) (new purchase only) | 633.24 |
| 10. TOTAL FINANCE CHARGE | 42.00 LESS UNEARNED FINANCE CHARGE 1.46 (Item 2) | | |
| 11. DEFERRED PAYMENT PRICE | 698.24 (Sum 5, 8, 10) | 8. TOTAL TIME BALANCE | 396.00 |
| | | Number of Payments | (12) |

| N. C. STORES ONLY: | | ANNUAL PERCENTAGE RATE: 21.75 % |
|---|---|---|
| TAXABLE | $ | |
| NON TAXABLE | $ | |

| NEW | X | ADD | X | RE-OPEN | This Agreement includes all Goods listed on our Purchase Money Security Agreement Nos. → | 30478 30806 |
|---|---|---|---|---|---|---|

The BUYER has this day paid the cash sum of $ 82.00 receipt no. 106664 BUYER agrees to pay the unpaid portion of this purchase price at the rate of $ 33.00 each month payable on 5th beginning 5th of Aug. 1973 until the TOTAL TIME BALANCE is paid in full.

It is further agreed that any unpaid balance on any other purchase by the BUYER from the SELLER shall be merged into and become a part of this Purchase Money Security Agreement and the entire purchases become security for the entire balance with terms of payment as set forth in this agreement.
Failure of the BUYER to make payments as hereinabove specified when due shall, at the option of the SELLER or successors, or assigns, make the entire debt become due and payable and the SELLER is hereby authorized and empowered to enter any premises and take possession of the GOODS.
BUYER warrants that the GOODS are purchased primarily for personal, family or household use and that his address is shown above.
The SELLER reserves the right at any time before delivery of the GOODS to cancel this agreement in the event BUYER'S credit report is not satisfactory to the SELLER.
**"NOTICE" This Agreement is subject to the additional provisions set forth on the reverse side hereof.**

**KIMBRELL'S, INC.**
CHARLOTTE, N. C.
BY _____ (SELLER)

_Sally Barber_ (L.S.) (BUYER)
_____ (L.S.) (BUYER)

| PURCHASE MONEY SECURITY AGREEMENT NUMBER: |
|---|
| 33438 |

**APPENDIX A**

## THE DEFENDANTS

The defendant Kimbrell's, Inc., which sold the furniture to the plaintiff, is a North Carolina corporation. Kimbrell's, Inc. is a wholly owned subsidiary of Furniture Distributors, Inc., also a North Carolina corporation. Furniture Distributors, Inc., through some thirty wholly owned corporate subsidiaries, operates a chain of forty-eight Kimbrell's furniture stores in North Carolina, South Carolina and Georgia. Kimbrell's, Inc. and Furniture Distributors, Inc. share a common headquarters in the Kimbrell's executive offices at 4524 South Boulevard, Charlotte, North Carolina.

The officers and directors of Furniture Distributors, Inc. and all of its subsidiaries are substantially the same. The exceptions are inconsequential (for example: W. C. Kimbrell is president and J. A. Kimbrell is vice president of the North Carolina based corporations, whereas in the South Carolina based corporations the roles of these two men are reversed).

The officers and directors of Kimbrell's, Inc. and of the parent company, Furniture Distributors, Inc., participated in the development and preparation of the standard contract form (APPENDIX "A") and distributed the form for use in Kimbrell's, Inc. and each of the other forty-seven retail stores in the Kimbrell's chain.

From 1969 to March, 1975, each of the forty-eight individual retail furniture stores, in all extensions of credit to customers, used essentially the same contract form which is found in APPENDIX "A". The only difference among the contract forms was the name and address of the local store printed in the upper left corner.

In March, 1975, after this suit was filed, the form was altered in one respect—the term "Total Time Balance" was crossed out and replaced with the term "Total of Payments." The altered form was uniformly used after March, 1975, in all the retail outlets.

Kimbrell's, Inc. regularly extends or offers to extend credit to its retail customers (such as plaintiff) who purchase furniture.

Furniture Distributors, Inc. has knowledge of the credit terms for all the consumer credit sales by its subsidiaries in that each consummated contract is sent to the Kimbrell's executive office at 4524 South Boulevard, Charlotte, North Carolina, for review.

The transactions between plaintiff and the class she represents on the one hand, and the defendants on the other, are not exempted from coverage by the Truth-in-Lending Act, 15 U.S.C. § 1603.

Kimbrell's, Inc. is a "creditor" within the meaning of 15 U.S.C. § 1602(f) and Regulation Z, § 226.2(s) (amended October 28, 1975, formerly subsection (m)), by its own admission, in that it regularly extends consumer credit or offers to extend credit to its retail customers.

■ Furniture Distributors, Inc. is a "creditor" the same as its wholly-owned subsidiary, Kimbrell's, Inc., because of the overlapping corporate officers, directors and offices, and its domination of its subsidiary's extension of credit. Particularly, Furniture Distributors, Inc. is inextricably tied in with its subsidiaries in the way it has prepared the form contract and insured its use in all credit dealings with customers. Thus, Furniture Distributors, Inc. is an "extender of credit" the same as Kimbrell's, Inc. *Zale Corp. v. FTC,* 473 F.2d 1317 (5th Cir. 1973); *NLRB v. Deena Artware,* 361 U.S. 398, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960); *Pilot Title Insurance Company v. Northwestern Bank,* 11 N.C.App. 444, 181 S.E.2d 799 (1971).

In addition, Furniture Distributors, Inc. is a creditor or an "arranger of credit" under the definition in Regulation Z, § 226.2(h), in that it has knowledge of the credit terms of the consumer transactions of all its subsidiaries and has participated extensively in the preparation of the form contract documents. *Whitman v. Connecticut Bank & Trust Company,* 400 F.Supp. 1341 (D.Conn. 1975).

## THE VIOLATIONS OF THE TRUTH–IN–LENDING ACT

It is necessary to look at the contract (APPENDIX "A") in order to understand this decision.

The form contract, or "PURCHASE MONEY SECURITY AGREEMENT," when it is used to cover financing of new purchases consolidated with refinancing of previous credit purchases, makes disclosures in two parallel vertical columns. The information cannot be derived by reading straight down either column. The computations and disclosures require the reader to switch back and forth between the two columns of figures. The result is a confusing situation which is not yet thoroughly understandable to me despite a considerable period of study.

In a number of particulars the evidence demonstrates that the defendants have violated the Truth-in-Lending Act. These violations include:

A. Misleading labels instead of precise terminology.

B. Inclusion of additional information which obscures required information.

C. Failure to disclose components of finance charges.

D. Lack of meaningful sequence in the listing of information.

These violations will be separately discussed.

A. *Misleading labels where precise terminology is required.—*

1. Regulation Z was put out by the Federal Reserve System to assist in implementing the Act. Section 226.8(b)(3) requires disclosure of:

(3) The number, amount, and due dates or periods of payments scheduled to repay the indebtedness and, except in the case of a loan secured by a first lien or equivalent security interest on a dwelling made to finance the purchase of that dwelling and except in the case of a sale of a dwelling, the sum of such payments using the term, "total of payments."

Nowhere does defendants' form contract use the term "total of payments." Instead, in item number 8 of the right column of the contract, the term "TOTAL TIME BALANCE" is used to refer to what is apparently the "total of payments." This violates Regulation Z, § 226.8(b)(3). The Truth-in-Lending Act and Regulation Z call for precise, uniform, nationwide disclosures rather than approximations or terminology devised by each individual creditor. *Grubb v. Oliver Enterprises, Inc.,* 358 F.Supp. 970 (N.D.Ga.1972).

2. Regulation Z, Section 226.8(c) requires that the contract disclose:

(1) The cash price of the property or service purchased, using the term "cash price."

(2) The amount of the downpayment itemized, as applicable, as downpayment in money, using the term "cash downpayment," downpayment in property, using the term "trade-in" and the sum, using the term "total downpayment."

(3) The difference between the amounts described in subparagraphs (1) and (2) of this paragraph, using the term "unpaid balance of cash price."

(4) All other charges, individually itemized, which are included in the amount financed but which are not part of the finance charge.

(5) The sum of the amounts determined under subparagraphs (3) and (4) of this paragraph, using the term "unpaid balance."

(6) Any amounts required to be deducted under paragraph (e) of this section using, as applicable, the terms "prepaid finance charge" and "required deposit balance," and, if both are applicable, the total of such items using the term "total prepaid finance charge and required deposit balance."

(7) The difference between the amounts determined under subparagraphs (5) and (6) of this paragraph, using the term "amount financed."

(8) Except in the case of a sale of a dwelling:

(i) The total amount of the finance charge, with description of each amount included, using the term "finance charge," and

(ii) The sum of the amounts determined under subparagraphs (1), (4), and (8)(i) of this paragraph, using the term "deferred payment price."

The requirement of subsection (8)(ii) was not followed. It is true that the term "deferred payment price" was used; but it was used in two different places for two different figures. In the left hand column, line number 11, the entry was "DEFERRED PAYMENT PRICE 698.24 (Sum 5, 8, 10)." In the right hand column, line number 7 reads "DEFERRED PAYMENT PRICE (new purchase only) (Sum of 1, 4, 6) 633.24." One schooled in the art of reading these documents (which this court is not) can ultimately figure out that the correct "deferred payment price" is $698.24. However, the repeated use of the same phrase to describe different totals is a violation not only of Section 226.8(c)(8)(ii), but is also a violation of Regulation Z, Section 226.6(c), which will be discussed next.

B. *The form obscures required information by inserting inadequately defined additional information.*—

Section 226.6(c) provides:

(c) *Additional information.* At the creditor's option, additional information or explanations may be supplied with any disclosure required by this part, but none shall be stated, utilized, or placed so as to mislead or confuse the customer or contradict, obscure, or detract attention from the information required by this part to be disclosed. Any creditor who elects to make disclosures specified in any provision of State law which, under paragraph (b) of this section, is inconsistent with the requirements of the Act [section 1601 et seq. of this title] and this part may

(1) Make such inconsistent disclosures on a separate paper apart from the disclosures made pursuant to this part, or

(2) Make such inconsistent disclosures on the same statement on which disclosures required by this part are made; provided:

(i) All disclosures required by this part appear separately and above any other disclosures,

(ii) Disclosures required by this part are identified by a clear and conspicuous heading indicating that they are made in compliance with Federal law, and

(iii) All inconsistent disclosures appear separately and below a conspicuous demarcation line, and are identified by a clear and conspicuous heading indicating that the statements made thereafter are inconsistent with the disclosure requirements of the Federal Truth in Lending Act.

The defendants' form violates Section 226.6(c) in several ways:

1. For example, it uses the required term "FINANCE CHARGE" in four different places. In left hand column, line 2, the "FINANCE CHARGE Discount" is listed as "$1.46 (Rule 78ths)"; in left hand column, line 10, the "TOTAL FINANCE CHARGE" is listed as "$42.00 less unearned FINANCE CHARGE 1.46 (Item 2)"; in the right hand column, line 6, the "FINANCE CHARGE" is listed as $40.54. The customer is apparently expected to guess the true finance charge from these four conflicting entries. As it turns out, when the document is studied with extreme care and patience, the true finance charge is actually $42.00, which is listed as "TOTAL FINANCE CHARGE" in the first part of the left hand column, line 10.

2. In Mrs. Barber's case the "FINANCE CHARGE" of $40.54 disclosed in right column, item 6, is not the finance charge as that term is defined in Regulation Z § 226.-2(w) and § 226.4. Use of the term in this manner is disclosure of incorrect additional information not required by the Act which confuses the important but required disclosures.

3. The term "FINANCE CHARGE Discount 1.46" in the left column, line 2, also presents additional information not required by the Act. The word "Discount"

suggests a bargain or a reduction in price or cost. There was no such discount. The $1.46 is a *rebate* (required by state law) of *unearned* charges for financing the earlier merged transaction. This information is therefore not only unnecessary but misleading, incorrect and confusing.

4. Other terms are also duplicated. The phrases "TOTAL DOWN PAYMENT" "UNPAID BALANCE OF CASH PRICE," "RECORDING FEE" and "AMOUNT FINANCED" all appear in each of the two parallel columns. The partially explanatory material underneath these phrases does not reveal without close and intelligent study just what these duplicate terms mean. Their use in this fashion violates Section 226.6(c) of Regulation Z.

C. *Components of the finance charge are not disclosed.—*

Regulation Z, § 226.8(c)(8)(i) quoted above requires disclosure of the "total amount of the finance charge, with description of each amount included, using the term 'finance charge'." Assuming that the careful borrower has decided whether his "FINANCE CHARGE" is the "TOTAL FINANCE CHARGE" of $42.00 in left hand column, line 10, or the "UNEARNED FINANCE CHARGE" of $1.46 which appears in the extension of line 10, or the "FINANCE CHARGE" of $40.54 in right hand column, line 6, he can nowhere find on the contract a clear description of the amounts included in the term "FINANCE CHARGE." This violates Regulation Z, Section 226.8(c)(8)(i).

D. *Lack of meaningful sequence in the disclosures.—*

Section 226.6(a) reads as follows:

(a) *Disclosures; general rule.* The disclosures required to be given by this part shall be made clearly, conspicuously, in meaningful sequence, in accordance with the further requirements of this section, and at the time and in the terminology prescribed in applicable sections. Except with respect to the requirements of § 226.10, where the terms "finance charge" and "annual percentage rate" are required to be used, they shall be printed more conspicuously than other terminology required by this part and all numerical amounts and percentages shall be stated in figures and shall be printed in not less than the equivalent of 10 point type, .075 inch computer type, or elite size typewritten numerals, or shall be legibly handwritten.

This requirement is violated in several particulars by the defendants' contract:

1. The contract taken as a whole does not make its disclosures clearly, conspicuously, in meaningful sequence or manner. Required terminology is omitted and terminology not required is added in a confusing manner. Identical terms are used for different disclosures. The computation requires zig zagging across the page in an irrational fashion.

2. The "TOTAL OF PAYMENTS" (shown incorrectly as "TOTAL TIME BALANCE" in the right hand column, line 8) is not computed nor disclosed in meaningful sequence. This figure, upon careful inspection, is discovered to be the product of the number of payments multiplied by the amount of each regular installment payment. However, the number of payments does not appear anywhere above line 8, nor does the amount of each monthly payment appear anywhere above that spot, and it is necessary to go down into the fine print and additional entries below that line to discover that the amount of each payment is $33.00. This form of disclosure therefore violates not only Section 226.8(b)(3) as indicated above, but also violates Section 226.6(a) by its failure to make disclosures "clearly, conspicuously, in meaningful sequence."

3. The "TOTAL OF PAYMENTS" is not clearly shown as the sum of the amount financed and the finance charge. This item (incorrectly described in right column, line 8, as "TOTAL TIME BALANCE 396.00") is by simultaneous inspection of both columns discovered to be the total of left column, line 9, the "Amount Financed 354.00" and the "TOTAL FINANCE CHARGE 42.00"

which is in left column, line 10. Again, it is necessary to zig zag from right to left in order to make sense out of the entries, and to add two items from line 9 and line 10 of the left hand column in order to reach the total of line 8 in the right hand column.

4. The number of payments and the amount of each payment and the dates they are due are not disclosed in meaningful sequence as required by Regulation Z, § 226.6. On this form, the number of payments ("12") appears in the right hand column as an unnumbered line just below line 8. The amount of each payment ($33.00) appears in the legend on the opposite side of the page and several lines below line 8. The information is on the form, but it takes considerable ingenuity to relate these items to each other.

The meaningful sequence rulings made herein are supported by decisions of other courts: *Allen v. Beneficial Finance Company*, 531 F.2d 797 (7th Cir. 1975); *Garza v. Chicago Health Clubs, Inc.*, 347 F.Supp. 955 (N.D.Ill.1972). As stated in *Garza* (a case similar in principle although this quotation refers to the Retail Installment Credit Act rather than Truth-in-Lending), 347 F.Supp. at 961: "The statutory purpose of giving the debtor effective notice of the terms and costs of credit is best served if the requirement that disclosures be in 'meaningful sequence' is read to mean that those disclosures which are logically related must be grouped together rather than scattered through the contract." The Federal Reserve Board has interpreted the meaningful sequence requirement in Public Position Letter No. 780 (April 10, 1974), as follows:

"The words 'in meaningful sequence' in § 226.6(a) relate to a presentation of required disclosures in a logical order with respect to those items which have an arithmetical relationship to each other. For example, many of the items called for in § 226.8(b), (c) and (d) are arithmetical and follow each other in logical progression. The remaining items are informative and have no particular interdependence. A meaningful sequence would call for those items which are arithmetically related to appear within a reasonable proximity to each other, not mixed with items which are irrelevant to a progression of arithmetical computations or thought. We realize that it is not always practical to list the items in vertical order, but in keeping with the purpose of the Truth-in-Lending Act, they should be placed in reasonable proximity to each other so that the customer will not be required to search for any arithmetical items which should logically follow a previous one."

The contract violates the meaningful sequence provision of Regulation Z in two ways. First, the disclosure terms are not sequentially arranged. Second, a number of the terms of the contract appear in several places on the contract.

The court concludes as a matter of law that in the above matters the contract between the defendants on the one hand and the plaintiff and the members of her class on the other hand violated the Truth-in-Lending Act and the defendants are civilly liable to the plaintiff and the members of her class.

From the affidavits of defendant and from the arguments and briefs of counsel, the court finds that there are no mathematical or computational errors excusing the violations and there are no specific rules, regulations or interpretations of the Federal Reserve Board relied on by defendants which have later been amended, rescinded or determined to be invalid by judicial or other authority.

Defendants are not entitled to rely on purported defenses asserted under 15 U.S.C. § 1640(c) ("bona fide error" defense) or 15 U.S.C. § 1640(f) ("good faith reliance" defense). *Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161 (7th Cir. 1974); *Mirabal v. GMAC*, 537 F.2d 871 (7th Cir., 1976); *Ives v. W. T. Grant Company*, 522 F.2d 749 (2nd Cir. 1975).

Plaintiff and the class she represents are entitled to recover of the defendants, under the civil liability provisions of the Act, 15 U.S.C. § 1640.

## THE CLASS ACTION

The class action statute, 15 U.S.C. § 1640, was amended by 1974 Public Law 93–495, effective October 28, 1974, and applicable to pending litigation such as this case. Section 1640 reads in pertinent part as follows:

§ 1640. *Civil liability—Individual or class action for damages; amount of award; factors determining amount of award*

(a) Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part or part D of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—

(1) any actual damage sustained by such person as a result of failure;

(2)(A) in the case of an individual action twice the amount of any finance charge in connection with the transaction, except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000; or

(B) in the case of a class action, such amount as the court may allow, except that as to each member of the class no minimum recovery shall be applicable, and the total recovery in such action shall not be more than the lesser of $100,000 or 1 per centum of the net worth of the creditor; and

(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court.

In determining the amount of award in any class action, the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional.

Pursuant to the direction in the concluding sentence of Section 1640(a)(3), the court makes the following findings of fact:

1. No actual damages were proved. However, the contract form is so confusing and difficult and misleading that the potential damage to numerous customers from mathematical errors, from inability to shop around intelligently and from lack of understanding is great.

2. The failures of compliance with the law on the part of the defendants were frequent and persistent and over a long period of time. The contract at issue was used in forty-eight stores in the two Carolinas and Georgia in all consumer credit transactions from 1969 to March, 1975. Use of the form was continued for almost a year after this action was filed. The only change made since 1969 was a change from "TOTAL TIME BALANCE" to the required "TOTAL OF PAYMENTS" in the right hand column, line 8.

3. Defendants have large resources. The total net worth of Furniture Distributors, Inc., which includes the net worth of Kimbrell's, Inc., in 1973 was $15,444,694.00; in 1974 was $17,195,462.00; and in 1975 was $18,616,165.00. The parent corporation is legally responsible for the use and continued use of the form contract described in this decision.

4. The number of persons adversely affected is large. Affidavits of defendants show that approximately a quarter of a million contract sales were made by the stores in the chain during the period the contract was in use. A large majority of these sales were sales to repeat customers, and involved "add on" transactions in which an existing credit balance was consolidated and refinanced. The class of plaintiffs which was certified in this case (740 in number) is made up of customers of only one of the forty-eight stores and it is obviously only a small fraction of those who have been adversely affected.

5. The use of the form and its continued use after this suit was filed was intentional on the part of the defendants. There is no way to read the form and conclude that it complies with the requirements of the statutes. The form was adopted, according to

the defendants, after exhaustive study and conference and with knowledge on the part of the officers and directors who adopted it that they were subject to the Truth-in-Lending Act and to Regulation Z. They intended to produce the contract, and did produce and use it, and are responsible for its failure to meet the standards of the Act and of the Regulation.

6. If plaintiff Barber had sued only as an individual, a judgment in her favor that the contract violates the Truth-in-Lending Act might well have entitled other individual claimants to judgment in their favor under principles of collateral estoppel. This has some bearing upon determination of the damages within the class action limit ($100,-000.00, or 1% of the creditors' net worth, whichever is smaller).

 I have concluded that a civil penalty should be assessed in the amount of $100,-000.00 plus costs and attorneys' fees. There should be no question as to the reasonableness of this figure in view of the fact that the class of 740 herein dealt with includes customers at only one of the forty-eight stores, and over only a portion of the period during which the contract in question was in wide use.

All findings of fact herein shall be treated as conclusions of law and all conclusions of law shall be treated as findings of fact; and all supporting evidence not mentioned in the foregoing brief findings of fact is also relied upon in support of the conclusions reached and the judgment hereinafter entered.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED:

1. That the plaintiff's motion for partial summary judgment is granted.

2. That the motion of the defendant Furniture Distributors, Inc. for summary judgment is denied.

3. Defendants are ordered to pay to the plaintiff and the class she represents the sum of $100,000.00 plus interest at 6% from the date of this judgment, for distribution among the named plaintiff and the members of the class, excluding those members whose contracts with Kimbrell's were executed more than one year before the commencement of the class action on October 29, 1974.

4. Counsel for plaintiff are directed to tender by December 15, 1976, a supplemental order providing in detail for the distribution to the plaintiff and the members of the class.

5. Defendants shall pay the costs of this action to be taxed by the clerk, and attorneys' fees in the amount of $25,000.00, which the court finds to be a reasonable sum under the circumstances.

6. Costs recoverable shall include the costs of making distribution of the funds to the members of the class. The plaintiff and defendants are invited to collaborate on the most economical method for doing this, and to give consideration to distribution by or with the aid of office and other facilities of the defendants.